Decided 27 April, 1903.

**HILGAR v. MILLER.**

[72 Pac. 319.]

ORAL TESTIMONY—CONCLUSIVENESS OF WRITTEN AGREEMENT.*

1. Where parties to a deed deposited in escrow agreed in writing that it should be delivered if the grantee should furnish the grantor with support during his life, and decent burial. parol evidence of preliminary conversations to show that the grantee expected the grantor to go to a soldiers' home, and that therefore the minds of the parties did not meet on a contract, is not competent, for the writing is conclusive, no mistake or imperfection being claimed, and its validity not being disputed.

IDEM.

2. Where a written agreement for the delivery of a deed deposited in escrow provided that the grant should be inoperative if the grantee failed to perform specified conditions, parol evidence of statements of the grantor that he intended to give the property to the grantee is inadmissible, for it would vary the written agreement showing a consideration for the transfer.

EVIDENCE OF CONSIDERATION FOR DEED.

3. The evidence in this case satisfactorily shows that the agreement of the grantee to care for the grantor during his life, and to provide a decent burial for his remains, was faithfully carried out so far as the conduct of the grantor permitted, and that the conditions of the grant were substantially complied with.

From Jackson: HIERO K. HANNA, Judge.

This is a suit by Minerva E. Hilgar and others against J. W. Miller and wife to set aside a deed, and to compel an account-

---

*NOTE.—Section 704, B. & C. Comp., provides: "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases: 1. Where a mistake or imperfection of the writing is put in issue by the pleadings. 2. Where the validity of the agreement is the fact in dispute.

ing for the rents and profits of certain real property.  The facts are that on May 9, 1899, Jacob G. Grossman, being the owner of lots 11 and 12 in block 66 in Medford, executed to J. W. Miller, the defendant, a warranty deed therefor, which was deposited with the Jackson County Bank, to be delivered immediately upon Grossman's death, provided Miller faithfully cared for and furnished him during his natural life all needful food, clothing, medicine, and medical attendance, and a decent burial at his death; but if he failed, neglected, or refused to keep or perform either of said conditions, the deed was to be redelivered to Grossman, or to his heirs or assigns.  Grossman was thereupon moved to Miller's house, where he remained, receiving the stipulated care and necessaries, until July 1, 1899, when he went to the soldiers' home at Santa Monica, California, where he died intestate August 17th of that year; the expenses incident to his residence and burial there having been borne by the managers of said home.  Grossman left surviving him Hannah, his widow; McCoy, a son; Plummer and Gertrude Miller, children of a deceased daughter; and the plaintiffs Minerva E. Hilgar and Amanda Bates, daughters—none of whom reside in this state.  Grossman left other property in Jackson County, Oregon, for which the county court thereof appointed an administrator, who, having fully settled the estate, was discharged.  Mrs. Hilgar secured from her mother, brother, nephew, and niece conveyances of their respective interests in said lots, and, her husband and sister joining her as plaintiffs, instituted this suit, alleging that on May 9, 1899, Grossman, by reason of his advanced age, physical weakness, and mental infirmities, was incompetent to enter into any contract, which fact Miller well knew; that the deed was executed at Miller's request, and in consequence of his representations that he would perform the stipulations of the escrow agreement, upon the faith of which Grossman relied; that said lots were of the reasonable value of $1,000, but Miller had caused a consideration of $700 to be named in the deed, upon a representation that the services to be performed were reasonably worth that sum, no part of which had ever been paid, except

$30 expended in the care of Grossman after the deed was executed; that about July 1, 1899, Miller, in violation of his agreement, caused Grossman to be sent to the soldiers' home, refusing to aid or assist him in any manner, and after his death fraudulently secured possession of the deed by representing that he had faithfully kept all the conditions undertaken by him, when he had not performed any of them, upon which statement said bank relied, and the deed was thereupon recorded in said county; that, prior to the commencement of this suit, plaintiffs tendered to Miller the sum of $30 so expended by him, and demanded a reconveyance of the lots, but he refused to comply therewith; and that he had collected large sums as rents and profits of the premises, the amount of which they were unable accurately to state.

The answer denies the material allegations of the complaint, and avers that, at the time the deed was executed, Grossman was in such a physicial condition as to require constant care and attention; that for many years prior thereto he had purposely isolated himself from his family, but entertained for Miller a strong friendship, and executed said deed to him without solicitation; that prior to May 9, 1899, Grossman had made arrangements to enter said soldiers' home, and intended to leave therefor as soon as his health would permit; that when he went away it was agreed that, if he should become dissatisfied, he would return to Medford, and receive the care and attention stipulated for; and that until his death Miller was at all times ready, able, and willing to keep his agreement, every condition of which he performed, except in so far as he was prevented from doing so by Grossman's absence. The reply having denied the material allegations of new matter in the answer, a trial was had, resulting in a decree to the effect that Miller was the owner in fee of said lots, and plaintiffs appeal.

AFFIRMED.

For appellants there was a brief over the names of *Snell & Hartson, William I. Vawter,* and *Hammond & Narregan,* with an oral argument by *Mr. C. P. Snell* and *Mr. H. J. Bigger.*

For respondents there was a brief over the names of *William M. Colvig* and *Charles Prim,* with an oral argument by *Mr. Colvig.*

MR. CHIEF JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

1. It is contended by plaintiff's counsel that the minds of the parties to the deed never met in respect to the services to be performed—Grossman requiring a home and attention, while Miller expected him to go to the soldiers' home, thereby relieving him from all responsibility—and hence no agreement was ever entered into as a foundation for the execution of the deed, and the court erred in awarding the lots to the defendant.. The rule is well settled that an offer by one person to another imposes no obligation upon the former unless it is accepted by the latter according to the terms on which it was made, and qualifications of or departure from those terms invalidate the offer unless the same be agreed to by the party who made it: Bishop, Contracts, § 323; *Eliason* v. *Henshaw,* 17 U. S. (4 Wheat.) 225. Miller testifies that on May 9, 1899, Grossman, in consideration of the lots which he offered to convey, desired to be taken to his house, have his bills paid, and at his death a decent burial, and in reply thereto the witness remarked that, if Grossman should live four or five years, the property would not be sufficient compensation for the care and expense required. In explaining what was said in response to such objection, Miller says: "Either Mr. Grossman, or Whitehead, or Damon, and I can't remember which it was now, remarked that he was going to the home anyway, and he says, 'Then it will take the responsibility off your hands, and expenses;' and I think at that time Mr. Whitehead said, 'You better take it, Miller. I know you are somewhat involved;' and he says, 'You better take it.' I stood a minute and studied, and I says, 'Well, on that point I will risk it anyway.' So we passed that." We think the point insisted upon is without merit, for the written escrow agreement, signed by Grossman and Miller, supersedes all other understandings they may have had in relation to the services

required or to be performed and, as it was stipulated therein that Miller should care for and furnish these necessaries to Grossman, evidence of what they may have said prior to the consummation of their contract was inadmissible to vary or contradict its terms: *Lee* v. *Summers*, 2 Or. 260; *Portland Nat. Bank* v. *Scott*, 20 Or. 421 (26 Pac. 276); *Wilson* v. *Wilson*, 26 Or. 251 (38 Pac. 185).

2. What has been said upon this subject will apply with equal force to the testimony introduced by Miller tending to show that, prior to the execution of the deed, Grossman stated to several of the witnesses that he intended to give the property to him; for the stipulation in the escrow agreement, to the effect that the grant was to be rendered inoperative by a failure to perform any of the conditions assumed by Miller, conclusively refutes the idea of a donation.

3. It is contended by plaintiff's counsel that Miller, never having cared for or given any attention to Grossman after he started for the soldiers' home, or offered to pay the expenses incident to his burial, was not entitled to possession of the deed, the securing of which conveyed no title to the lots, and hence the court erred in decreeing that he was the owner thereof. A deed intrusted to a stranger as an escrow possesses no vitality until the condition is fully performed, or the event occurs, upon the faith or happening of which it was left with the depositary; and no delivery of it by him to the grantee prior to that time, without the grantor's consent, can give animation to the instrument, so as to convey title to the premises: Devlin on Deeds, § 322; *Gaston* v. *City of Portland*, 16 Or. 255 (19 Pac. 127); *Tyler* v. *Cate*, 29 Or. 515 (45 Pac. 800). It has been held that a grantee in a deed deposited as an escrow is only entitled to a delivery thereof upon a strict compliance with the stipulations upon his part which constitute conditions precedent to the transfer of the title: *Beem* v. *McKusick*, 10 Cal. 538; *Dyson* v. *Bradshaw*, 23 Cal. 528; *Hinman* v. *Booth*, 21 Wend. 267. A party to a contract may always dispense with its conditions which are favorable to him, and waive their performance: 3 Addison, Contracts, *1193. This author, illustrat-

ing the principle thus announced, says: "If the act covenanted
or agreed to be done by one party cannot be completed without
the concurrence of the party for whom it is to be done, the for-
mer must do all that he can do without such concurrence to
complete the act, and, if he does this, he does what is equivalent,
in law, to actual performance" (page *1194). The testimony
shows that Grossman had been a resident of Jackson County
about thirty years, and at the time of his death had government
bonds for $1,400 on deposit in one of the Medford banks. He
was a member of the Grand Army of the Republic, and, as
Miller belonged to the same order, they became and were very
close friends. R. H. Whitehead testifies that in the fall or early
winter of 1898 he was staying at Los Angeles, and Grossman at
Pasadena, California, and together they went to Santa Monica,
where the latter sought admission into the soldiers' home at
that place; but, there being no room for his accommodation, his
application was postponed until some months later, when, a
new building having been completed, he was notified that he
would be received, and transportation from Medford to Santa
Monica was sent to him. Prior to its receipt, however, he had
become so ill as to require constant care and attention, which
was furnished by his comrades, and at the time he executed
said deed the limit of the pass sent to him had expired. When
taken to Miller's he was quite sick, but, his health beginning to
improve, he stated to the witnesses Noble and Bowman that he
was well treated in his new home, and supplied with all he
wished. As soon as he became able to travel, his desire to go
to the soldiers' home increased, and he informed the witnesses
Bowman, Miller, Noble, and Whitehead that he intended to
leave; saying that he thought the trip to and the climate at
Santa Monica would be beneficial to him; remarking, however,
that if he was dissatisfied with the treatment which he might
receive at the home, or if his hopes of regaining his health were
not realized, he would return to Medford. His health having
very much improved, and having secured an extension of the
transportation, he left Medford July 1, 1899, for the soldiers'
home; but just prior to going he told Whitehead, a director in

the Medford bank, to keep his government bonds until he returned, and also left a Winchester rifle with A. H. Hooker, telling him he would need it when he came back. At the time the deed was made he was about seventy years old, and had suffered a slight paralytic stroke. M. S. Damon testifies that he had taken care of and nursed Grossman night and day for about two or three weeks prior to May 9, 1899, and in speaking of his condition during that time he says: "There were times when he wasn't in his right mind when I was taking care of him." The witness was present when the deed was signed, and in answer to the question, "What was his mental condition on the day he executed the deed?" replied, "Well, he was quite feeble." Q. "Did he have a clear conception, as far as you could determine, of what he was doing, or was his mind clouded? A. I think he did, right at the time." That Grossman possessed capacity to execute the deed is the opinion of the witnesses Hooker, Merriman, Noble, Whitehead, Miller, and his son, and this conclusion is amply supported by the evidence.

We think the testimony conclusively shows that from May 9, 1899, to July 1st of that year, Miller fully performed every condition of his agreement to the entire satisfaction of Grossman, who voluntarily left Medford, hoping that his health would be restored; expecting, however, if he was disappointed in this particular, or if he did not enjoy living at the home, to return and live with Miller. That he expected to come back is evidenced by the directions he gave Whitehead in relation to keeping his government bonds, and by what he said to Hooker about the rifle he left with him. Grossman possessed a strong will and was very careful in all matters relating to money transactions, and it is quite probable, if he had been obliged to go to the soldiers' home, he would have demanded a return of the deed; and his forbearance in that respect is a circumstance tending to corroborate his statements that he was well treated at Miller's, and to confirm the inference that his departure was voluntary.

It is argued, however, that soldiers whose term of service has

expired consider living at a place provided by a state or the
general government for their accommodation as in the nature
of an enforced residence in an almshouse, and that Grossman's
having left Miller's house to seek shelter at a soldiers' home
tends to show that he was compelled to secure care, attention,
and medical attendance which Miller neglected or refused to
furnish him.    No testimony was offered tending to show that
soldiers, as a class, entertain the sentiment attributed to them;
but, if such fact were conceded, we think Grossman did not
possess the characteristics of his comrades, for, having an in-
vestment of $1,400 in government bonds, he was not obliged to
accept the accommodation and treatment which a soldiers'
home affords its inmates.    Miller testifies that he was able,
ready, and willing to perform every condition stipulated for;
and we think, in so far as Grossman permitted him to do so, he
fully kept his contract.    Grossman having died at the soldiers'
home, and while an inmate thereof, it was admitted that the
expenses incident to his journey to, and residence and burial
at, Santa Monica, were borne by the managers of the home.
That his body was consigned to earth by representatives of a
nation grateful for sacrifices made by its defenders in times of
peril, and that the sepulchral rites were performed by com-
rades whose common experience of danger and privation
united them in a bond of sympathy, demonstrate that he re-
ceived the greatest honor and the most loving tribute that
could be paid to a loyal soldier.    If he had died at Medford,
his body could not probably have been given better interment;
and, as the costs of travel, residence, and burial, though not
defrayed by Miller, were not imposed as a charge upon Gross-
man's estate, the plaintiffs, as his heirs, suffered no injury
from a failure in this respect literally to keep the conditions of
the escrow agreement, which undoubtedly would have been
performed if Grossman's death had occurred where he so long
lived.    We believe that Miller faithfully performed every con-
dition assumed by him, so far as he was permitted to do so by
Grossman, and that he was entitled to the deed deposited with
the Jackson County Bank, which, when delivered, conveyed

the legal title to the premises.   It follows from these consider-
ations that the decree is affirmed.                                    AFFIRMED.


Decided 6 April, 1903.